**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LORRAINE JOHNSON,** Administratrix | ) | |
| of the Estate of Terry Johnson, and | ) | |
| Lorraine Johnson, Individually, | ) | Civil Action No. 09-234 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Chief Magistrate Judge Lenihan |
| | ) | |
| **LARRY MEDLOCK,** Warden of the | ) | Re: ECF Nos. 32, 35 |
| Fayette County Prison, in both his Official | ) | |
| and Individual Capacities, | ) | |
| **GEARY O'NEIL, ANTHONY DELVERME,** | ) | |
| **KEVIN LOCKE, DAVID SKILES,** | ) | |
| In their Official Capacities as Correctional | ) | |
| Officers of the Fayette County Prison and | ) | |
| in their Individual Capacities, | ) | |
| **JACQUELINE VANMETER ARISON,** | ) | |
| in her Official Capacity as Lieutenant | ) | |
| of the Fayette County Prison and in her | ) | |
| Individual Capacity, | ) | |
| **PRIMECARE MEDICAL, INC.,** and | ) | |
| **PRIMECARE MEDICAL, INC.,** t/d/b/a | ) | |
| Prime Care Medical and Prime Care Medical | ) | |
| Associates-UPMC, | ) | |
| **PRIMECARE MEDICAL** | ) | |
| **ASSOCIATES, INC., & PRIME CARE** | ) | |
| **MEDICAL ASSOCIATES,** t/d/b/a Prime | ) | |
| Care Medical and Prime Care Medical | ) | |
| Associates-UPMC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Presently before the Court are Defendants' Motions for Summary Judgment at ECF Nos.

32 & 35. Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 claiming violations of the

Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. The Court's

careful review of the record reveals numerous disputed issues of material fact. Consequently, the

Primecare Defendants' Motion for Summary Judgment at ECF No. 32 will be denied in its

entirety, and the Motion for Summary Judgment at ECF No. 35 filed by Fayette County

Defendants Medlock, O'Neil, DelVerme, Locke, Skiles, and Vanmeter Arison will be denied

except as it relates to Defendants O'Neil and Vanmeter Arison.


RELEVANT FACTS

The following facts are undisputed unless otherwise indicated.

Plaintiff's Decedent, Terry Johnson, ("Johnson") was housed in the Fayette County

Prison[1] (hereinafter "Jail") on February 22 through February 24, 2007, as a pretrial detainee for

the alleged violation of a temporary restraining order. His wife, Plaintiff Lorraine Johnson, had

secured a temporary PFA against her husband which was to remain in effect until February 27,

2007, or until modified by the court.

Johnson died sometime before 9:00 p.m. in his cell on February 24, 2007. Dr. Cyril

Wecht performed an autopsy on Johnson the next morning and concluded that he had died of

peritonitis, an infection of the abdominal wall, wherein Johnson sustained a spontaneous

perforation of the ileum and necrosis and gangrene of the small bowel. Dr. Wecht also noted a

large, post-operative ventral hernia. The Coroner's Certificate of Death reflected the same and

listed Johnson's cardiovascular disease, gastric bypass surgical procedure, and cocaine use, as

significant conditions contributing to death but not resulting in the underlying cause of death.

Defendants PrimeCare Medical, Inc., and PrimeCare Medical Associates, Inc.

(collectively "PrimeCare") entered into a Comprehensive Health Services Agreement with

Fayette County to provide health care services to the inmates and detainee population at the Jail.

(Comprehensive Health Services Agreement, ECF No. 50-1.) PrimeCare points to the medical

---

[1] Although called the "Fayette County Prison," the facility is a county jail.

records generated while Johnson was at the Jail to illustrate that by 10:15 a.m. on February 23, the medical intake procedure that began the night before was completed, and Johnson appeared to be in good health and voiced no complaints. PrimeCare states that at 2:45 p.m. on February 23, Johnson was brought to the medical unit complaining of chest pains, and that he was anxious about moving to the general population. At this time, his vital signs were taken and he was examined. An EKG was performed, and Inderal was administered. A representative of PrimeCare ordered that Johnson be left in isolation on the "B-range" section of the jail instead of putting him in the general population in order to relieve his anxiety. PrimeCare further indicates that Mr. Johnson was examined by one of its nurses at 9:00 p.m. on February 23; the nurse also checked his vital signs which were reported in the normal range. At 10:15 p.m., Mr. Johnson was sleeping in his cell with slow and easy respirations with no sign of distress. PrimeCare again points to its records indicating that at 4:15 p.m. the following day, February 24, less than 5 hours before his death, Johnson's vital signs were again in the normal range. PrimeCare states that at this time, Johnson did not indicate that he was in any pain, and never indicated that he needed or wanted to see a doctor; likewise, PrimeCare indicates that at no point did Johnson ever ask to see a doctor or be taken to a hospital. At 8:15 p.m., PrimeCare provided medications to Johnson during a medication pass. At that time, according to PrimeCare, Johnson had no complaints of chest pain. Another of PrimeCare's nurses indicated that she did speak with Johnson in detail on February 23 and 24, and he did not voice complaints to her, and he did not appear to be in pain, distress or discomfort.

Plaintiffs vehemently dispute PrimeCare's version of the facts and circumstances surrounding Johnson's death. Plaintiffs rely on the undisputed fact that Johnson died of peritonitis, and that "it is medically and factually impossible that Terry Johnson, who was dying

of peritonitis, would have vital signs in the normal ranges." (Plaintiffs' Responsive Concise Statement to Prime Medical, ECF No. 47 at ¶¶ 13, 26, 27, 29, 30, 31.) Likewise, Plaintiffs state that "it is medically impossible that Terry Johnson, who was dying of peritonitis, would have appeared fine, not communicated distress, and not been in visible and audible distress." (Plaintiffs' Responsive Concise Statement to Prime Medical, ECF No. 47 at ¶¶ 32, 33, 34, 37.) In support of their version of the facts, Plaintiffs rely on their expert, Leo Frangipane, M.D., who, in light of the undisputed cause of death, describes as follows:

> The timeline for such an event is well documented. It takes at least 12 to 24 hours for a piece of trapped bowel to lose its blood supply and die, eventuating in rupture and fecal spillage into the peritoneal cavity causing massive infection and death. The salient signs and symptoms of such an event from its onset invariably cause unrelenting pain generally at the hernia site. In this case it would be the upper abdomen or lower chest. The pain is not usually episodic but steady, intense and inexorably worsening. It is usually accompanied by nausea and vomiting and sense of "impending doom." The former takes place because of the bowel obstruction that invariably accompanies this process. The latter occurs because of the patient's awareness of a new, intense and previously unexperienced set of symptoms that are related to adrenalin effect. These include, [sic] restlessness, rapid heart rate, increase in blood pressure and high anxiety.
> . . .
> The process of this illness is excruciating. While all pain is subjective, most alert and oriented patients complain of pain at an 8-10 range out of 10 when medical personnel try to quantify it. Once peritonitis and gangrene ensue these patients are in extremis, with excruciating pain that causes extreme restlessness, agitation and heightened vocalization of their condition.
> . . .
> It is unlikely to the extreme that five hours prior to his death, Mr. Johnson's vital signs taken by a nurse employed by PrimeCare would have been normal. It is virtually impossible to record normal temperature of 98.4F with regular pulse rate of 84 and respirations of 18. In addition, a BP of 138/84 also seems highly unlikely. The acidosis and septic products of massive infection cause blood vessel muscular dysfunction that are revealed in rapid and thread pulse rate, dropping and faint Blood Pressure and rapidity of respirations, known as Tachypnea. All of these are

> signs of shock.  Temperature can be in the hypothermic or
> hyperthermic range but rarely in these cases is it seen to be normal.
>                           . . .
> It is impossible for someone dying of peritonitis to have appeared
> so symptom-free or to have been so silent.  Johnson would have
> been very vocal in expressing his state of extremis.  It is highly
> unlikely that Johnson, forty minutes before his death, appeared
> "fine[,]" sat up, took his medicine and expressed no distress.

(Expert Report of Leo G. Frangipane, Jr. M.D., F.A.C.S., ECF No. 49-1 at pp.1-3.)  Instead, Plaintiffs suggest that either Johnson's vital signs were not taken, or they were taken and inaccurately recorded.  Similarly, Plaintiffs suggest that in light of their expert's description of the progress of peritonitis, the PrimeCare Defendants ignored and/or omitted Johnson's true complaints in the medical records.

Fayette County Defendants Larry Medlock ("Medlock"), Geary O'Neil ("O'Neil"), Anthony DelVerme ("DelVerme"), Kevin Locke ("Locke"), David Skiles ("Skiles") and Jacqueline Vanmeter Arison ("Vanmeter Arison") (collectively "County Defendants") give an account similar to PrimeCare's.  The County Defendants state that Johnson was housed on "B" range in cell B-3, which is a camera equipped cell that is also used for suicide watches.  It is a locked unit where new commitments and inmates with disciplinary problems are housed.  "B" range consists of eleven (11) cells all facing in the same direction.  The cells have masonry walls on three sides, and bars on the front wall.  A common area is situated in front of the row of cells.  The common area is rectangular in shape and is bordered on three sides by bars.  The fourth side of the range consists of the barred walls to the cells.  Beyond the barred border of the range is a walkway, known in the Jail as the "catwalk."  Correctional officers can make their rounds in this catwalk, and are able to view the range and the cells from the catwalk.  The cells of "B" range are organized as follows:  As one faces the row of cells, the rightmost cell is cell B-1.  The cells

then continue in numeric order moving leftward, with the shower in the "B" range at the extreme right of cell B-1. As a locked unit, the inmates on "B" range are not free to roam around the range, but are confined to their cells. The video camera in cell B-3 is connected to a monitor on the desk of the officer assigned to "B" range. The desk is located outside of "B" range on the side closest to the shower and cell B-1. The desk is situated in a hallway that leads to the "B" range catwalk. The video monitor on the officer's desk allows the officer assigned to "B" range to view the inmate in cell B-3 via the video camera in that cell. The video camera and the monitor on the officer's desk were functioning during Johnson's incarceration. From the monitor, the officer could see Johnson in cell B-3. It is disputed whether the video from the cell was recorded. The County Defendants state that the video was not recorded, because the recording system was broken, although the County Defendants state that after Johnson's death, new equipment with recording capabilities was purchased and installed at the Jail. Conversely, Plaintiffs contend that correctional officers testified that to the best of their information, knowledge and belief, the recording feature of the video surveillance system was working on the night of Johnson's death.

The County Defendants state that Defendant Skiles (nick named "Gunny"), was the correctional officer on duty on "B" range during the 3:30 p.m. to 11:30 p.m. shift on February 23, 2007. Skiles indicated that he was informed that Johnson had an EKG, and that "he's all right." At a point between four (4) and six (6) o'clock p.m., Johnson complained of chest pain. Skiles indicated that he called a nurse from PrimeCare who told Skiles that Johnson had an EKG before he came on shift at 3:30 p.m. The nurse told Skiles to have Johnson lie down and relax. At the end of his shift, Skiles wrote in the log book[2] that Johnson complained of heart and arm

---

[2] The County Defendants state that officers at the Jail use log books to record information concerning their shifts and to pass information to correctional officers on later shifts. The log book for "B" range is kept on the officer's desk.

pain, that he needed Motrin, and the nurse checked him "and said O.K." Inmate Derrick Bradley filed an "Event Report/Statement" with the Jail dated February 28, 2007 reporting on an incident from February 24, 2007, wherein he indicated that he was on "B" range in cell B-6 when Johnson was telling Correctional Officer Skiles ("Gunie") that he needed to see a nurse and Skiles would not call her. In addition, inmate Erik Hamm testified in deposition that he heard "Gunie" tell Johnson "Shut the fuck up. You don't need your meds." (Hamm Dep. at 9, ECF No. 49-6 at 3.)

The County Defendants state that Correctional Officer Michael Hicks worked the next shift on the "B" range from 11:30 p.m. to 7:30 a.m. Hicks' notes in the log book reflect that at 12:45 a.m., inmate Joseph Pullem joined the "B" range, and was placed in cell B-9; at 3:10 a.m., inmate Erik Hamm joined the "B" range, and was placed in cell B-8; and at 4:30 a.m., inmate Michael Strejcek joined "B" range and was placed in cell B-10. Hicks indicated that at approximately 4:30 a.m., on Saturday, February 24, 2007, Johnson told him he was in pain and going through drug withdrawals. Johnson said his midsection hurt, and asked for OxyContin, Maalox and ginger ale. Hicks told Johnson that he could not give him those items. The County Defendants state that Johnson asked Hicks whether he had to do something to hurt himself to get these items. The County Defendants state that when Hicks saw Johnson put a piece of eyeglass to his neck, Hicks called an emergency code and Johnson was eventually placed on suicide watch.[3] The County Defendants state that a suicide watch log was prepared for Johnson that contains entries from 4:30 a.m. until the watch was discontinued after Johnson's death. Plaintiffs dispute whether the guards actually observed Johnson every fifteen (15) minutes as required and

_____

[3] The County Defendants state that when an inmate is placed on suicide watch, all potentially dangerous items are confiscated and the inmate is observed every fifteen (15) minutes. The observations are recorded by the correctional officer on a suicide watch sheet.

whether the content of the entries is truthful and accurate. Plaintiffs point to the testimony of

Inmate Joseph J. Pullem, Jr. who indicated the following:

> You sort of get tired of hearing the same guy moaning and
> groaning so I'm—I bitched to the security C.O.s, to "Hey, do
> something. Quiet that guy down. Do something." That happened
> earlier in the evening before breakfast about 5:00 o'clock when the
> lights come on. This is while the lights are off the guy –I said, "Do
> something with that guy. Shut him up."

(Pullem Dep. at 10, ECF No. 49-6 at 6.)

At 7:30 a.m. on February 24, Correctional Officer Hicks' shift concluded and Defendant

DelVerme's shift began. At approximately 8:15-8:30 a.m., Johnson told DelVerme that he had

an accident in his pants and needed a shower. DelVerme received approval from the shift

commander for Johnson to take a shower. DelVerme opened Johnson's cell, Johnson walked to

the shower, and DelVerme got Johnson a clean set of clothes. Inmate Erik Hamm testified that,

at some point, he overheard DelVerme tell Johnson the following: "You know, you need to shut

the fuck up. We'll tell your wife you went quickly[.]" (Hamm Dep. at 9, ECF No. 49-6 at 3.)

Inmate Hamm further testified that Johnson "really wasn't talking to the other inmates. I mean,

he was just crying out all day to the C.O.s: 'Please help me. Call my wife. I need my meds.

Will you take me to the hospital?' This was all day." (Hamm Dep. at 10, ECF No. 49-6 at 2.)

Finally, inmate Hamm indicated the following:

> Q.      (By Mr. Geary) In addition to what Terry Johnson was
> saying, was he making any sounds from his cell other than –
>
> A.      He was crying, I mean literally crying for help.
>
> Q.      And when you say "literally crying," what do you mean,
> literally crying?
>
> A.      Crying. I mean I could hear him crying. "Please . . . ."

(Hamm Dep. at 10, ECF No. 49-6 at 2.)  Yet, in his deposition, DelVerme testified that Johnson did not say anything to him or communicate in any way to DelVerme that he was sick.  (DelVerme Dep. at 29-30, ECF No. 49-6 at 4-5.)

At 3:30 p.m., DelVerme's shift ended and Defendant Locke came on shift for the "B" range.  At approximately 5:47 p.m., Defendants state that Locke spoke to Johnson and asked how he was doing.  Defendants state that in response to Locke's inquiry, Johnson did not complain about being sick or request a doctor.  The County Defendants state that around 8:30 p.m., a fight between inmates broke out on the "A" Block.  Officer Locke and others responded in an attempt to subdue inmates.  Following the altercation on the "A" Block, Locke looked into Johnson's cell.  Johnson was lying on his bunk and it appeared to Locke that Johnson was not breathing.  All emergency response efforts, and Johnson died.

Plaintiffs dispute Locke's statements that Johnson did not complain about being sick or request a doctor.  They point to the above testimony of Inmate Hamm as well as the testimony of Inmate Joseph Pullem, Jr..  Further, Plaintiffs note that Inmate Michael Strejcek testified as follows:

> Like you could hear a certain, you know, tone in his voice where – you know, you can't fake certain things, you know.  He sounded a certain way, like, you know, he was seriously in trouble at certain points.
> And the other thing that I found odd was if, you know something—if it wasn't serious, I mean his persistence.  It was just all the time.  He would just do it, you know nonstop.  And he would take abuse from the people around him and just didn't care.  He just still screamed.  You know, he'd still scream out.

(Strejcek Dep. at 13, ECF No. 49-6 at 7.)  In addition, Plaintiffs again rely on their Expert Report to dispute the County Defendants' factual account of the circumstances leading up to Johnson's death.  Specifically, Plaintiffs state that "it is medically impossible that Terry Johnson, who was

dying of peritonitis, would have appeared fine, not communicated distress, and not been in visible and audible distress.

SUMMARY JUDGMENT STANDARD[4]

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact; that is, the movant must show that the evidence of record is insufficient to carry the non-movant's burden of proof. *Id.* Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis added by *Matsushita* Court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v.*

---

[4] Fed. R. Civ.56 was recently amended; the amendment went into effect on December 1, 2010. Pursuant to 28 U.S.C. § 2074(a) and the April 28, 2010 Supreme Court order*, the amendment will govern all proceedings commenced on or after December 1, 2010, and all proceedings then pending, "insofar as just and practicable." United States Courts, *Rules and Procedures*, *Rules and Forms Amendments Effective 12/1/10* (Jan. 11, 2011, 1:36 PM), http://www.uscourts.gov/RulesAndPolicies/FederalRulemaking/Overview/RulesForms120110.aspx. The amendment to Fed. R. Civ. P. 56 has not changed the substantive standard for summary judgment. Consequently, when necessary, the Court quotes to the amendment. *See generally,* Interview with United States District Judge Mark B. Kravitz, *Examining the State of Civil Litigation, An Interview with the Chair of the Judicial Conference Advisory Committee on Civil Rules*, The Third Branch, July 2010, at 10-11.

*Liberty-Lobby, Inc*., 477 U.S. 242, 248 (1986). In *Anderson*, the United States Supreme Court

noted the following:

> [A]t the summary judgment stage the judge's function is not
> himself to weigh the evidence and determine the truth of the matter
> but to determine whether there is a genuine issue for trial. . . .
> [T]here is no issue for trial unless there is sufficient evidence
> favoring the nonmoving party for a jury to return a verdict for that
> party. If the evidence is merely colorable, or is not significantly
> probative, summary judgment may be granted.

*Id.* at 249-50 (internal citations omitted).

In support of their Motion for Summary Judgment, Defendants Medlock, O'Neil,

DelVerme, Locke, Skiles, and Vanmeter Arison argue as follows: 1) the County Defendants are

entitled to judgment as a matter of law because Johnson was under the care of health care

professionals, and non-medical personnel are not required to second guess the decisions made by

medical personnel; 2) record evidence is insufficient to impose liability on the correction officers

themselves; and 3) Warden Medlock is entitled to judgment as a matter of law because he had no

personal involvement in any alleged constitutional violation.

In support of their Motion for Summary Judgment, the Primecare Defendants argue as

follows: 1) record evidence does not show that these Defendants were deliberately indifferent to

Johnson's serious medical needs; 2) this corporate entity cannot be held vicariously liable

pursuant to 42 U.S.C. § 1983 for the actions of its employees under a theory of *respondeat*

*superior* and PrimeCare had no policies or customs that caused constitutional violations.

In response to the above arguments, Plaintiffs argue that this case involves a pure

credibility determination and that disputed issues of material fact preclude summary judgment.

Plaintiffs, however, do concede that as to Defendants Jacqueline Vanmeter Arison, and Geary

O'Neill, insufficient evidence exists to maintain this civil action against them.

ANALYSIS

Section 1983 of the Civil Rights Act provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Thus, to state a claim for relief under this provision, a plaintiff must demonstrate that the conduct in the complaint was committed by a person or entity acting under the color of state law and that such conduct deprived the plaintiff of rights, privileges or immunities secured by the Constitution or the laws of the United States. *Piecknick v. Commonwealth of Pennsylvania,* 36 F.3d 1250, 1255-56 (3d Cir. 1994).

DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

The due process clause of the Fourteenth Amendment prohibits the state from imposing punishment on pretrial detainees who have yet to be been convicted of any crime. *Bell v. Wolfish,* 441 U.S. 520, 535 (1979). The United States Court of Appeals for the Third Circuit, however, is guided by Eighth Amendment jurisprudence that prohibits the infliction of cruel and unusual punishment on convicted prisoners, as the due process rights of pretrial detainees are at least as great as the Eighth Amendment rights of convicted prisoners. *Woloszyn v. County of Lawrence,* 396 F.3d 314, 319 n.5 (3d Cir. 2005) (citing *Boring v. Kozakiewicz*, 833 F.2d 468, 471-72 (3d Cir. 1987)). Further, "no determination has as yet been made regarding how much

more protection unconvicted prisoners should receive." *Woloszyn*, 396 F.3d at 319 n.5 (quoting *Kost v. Kozakiewicz*, 1 F.3d 176, 188 n.10 (3d Cir. 1993)). Thus, Plaintiffs' Fourteenth Amendment medical treatment claims can be analyzed by recourse to cases decided in an Eighth Amendment context. *See Kost v. Kozakiewicz*, 1 F.3d 176 (3d Cir. 1993). *See generally Hubbard v. Taylor*, 399 F.3d 150, 164-67 & nn. 21-23 (3d Cir. 2005).

In *Estelle v. Gamble*, the United States Supreme Court noted that the most elementary principles underlying Eighth Amendment constitutional jurisprudence "establish the government's obligation to provide medical care for those whom it is punishing by incarceration." 429 U.S. 97, 103 (1976). The *Estelle* Court concluded that the Eighth Amendment prohibits the deliberate indifference to serious medical needs of prisoners. *Id*. at 104. The Court continued that a cause of action under § 1983 is thereby established "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id*. at 104-05 (footnotes omitted).

It was not until 1994, however, in *Farmer v. Brennan*, that the United States Supreme Court clarified its meaning of the term "deliberate indifference." 511 U.S. 825 (1994). In *Farmer*, the Court held as follows:

> We hold instead that a prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . . But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Id*. at 837-38.  The *Farmer* Court also discussed its reasoning in *Estelle*, noting that negligence in diagnosing or treating the medical conditions of prisoners will not rise to the level of an Eighth Amendment violation.  *Farmer*, 511 U.S. at 835 (quoting *Estelle*, 429 U.S. at 106).

Conversely, a plaintiff must also demonstrate a medical need that is objectively "sufficiently serious."  A medical need is "serious" if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.  *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).

The PrimeCare Defendants argue "that Plaintiffs merely disagree with the extensive course of treatment which Mr. Johnson was provided[,]" and that Plaintiffs have failed to show PrimeCare was deliberately indifferent to Johnson's medical needs.  (Brief in Support of Defendant PrimeCare Medical, Inc.'s Motion for Summary Judgment, ECF No. 33 at 4.)  In their Reply Brief, the PrimeCare Defendants quote from *Herman v. Clearfield County*, 836 F. Supp. 1178 (W.D. Pa. 1993), for the proposition that Plaintiffs may not rely on an expert report to create a disputed issue of fact because "[a] difference of opinion does not amount to a deliberate indifference to [the decedent's] serious medical needs."  (PrimeCare Defendants' Reply Brief, ECF No. 50 at 2-3 (quoting *Herman*, 836 F. Supp. at 1186).)  Here, Plaintiffs are not relying upon their Expert Report to demonstrate that the PrimeCare Defendants deviated from the standard of care.  Instead, Plaintiffs argue that in light of Johnson's undisputed cause of death, the sequence of events leading to his death as presented by all Defendants is factually and medically impossible.  Further, Plaintiffs have presented evidence from various inmates housed in close proximity to Johnson that raises a disputed issue of fact as to whether the medical and Jail records are an accurate representation of Johnson's medical condition on February 23-24,

2007.  Here, taking Plaintiffs' facts as true and all reasonable inferences that can be drawn

therefrom, a reasonable jury could conclude that all Defendants were deliberately indifferent to

Johnson's serious medical needs.

The County Defendants also argue that "a non-medical employee cannot be held be [sic]

deliberately indifferent to serious medical needs when an inmate is under a health care provider's

care," citing *Young v. Beard*, 2008 WL 2693859 (W.D. Pa. August 12, 2008).  (Brief in Support

of Motion for Summary Judgment, ECF No. 38 at 3-5.)  *Young* involved an inmate's special

dietary needs, and corrections officers' inability to second guess the medical opinion of treating

physicians in a prison setting as to these dietary needs.  The facts as presented by Plaintiffs and

all reasonable inferences that can be drawn therefrom readily distinguish this case from *Young*.

Here, evidence suggests that Johnson was screaming, crying out and moaning all day to the

corrections officers that he needed help, and that he was so vocal and persistent that other

inmates on the "B" range were themselves complaining to the corrections officers to do

something to quiet Johnson.  Contrary to *Young*, Johnson's behavior would have alerted the

corrections officers to the fact that Johnson needed medical attention, as opposed to the facts in

*Young*, where corrections officers would be unable to determine whether a prisoner's specific

dietary requests were warranted.  The case law is clear that a cause of action under § 1983 is

established "whether the indifference is manifested by prison doctors in their response to the

prisoner's needs or by prison guards in intentionally denying or delaying access to medical care."

*Estelle*, 429 U.S. at 104-05 (footnotes omitted).

The County Defendants also rely on *Spruill v. Gillis*, 372 F.3d 218, 224, 236 (3d Cir.

2004).  In *Spruill*, the United States Court of Appeals for the Third Circuit dismissed the case

against a corrections officer who, after receiving complaints from an inmate regarding severe

back pain, relied on the medical professionals who were treating the inmate, and responded: "so, what do you want me to do?" *Id.* at 224. The court of appeals continued that "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Id.* at 236. Here, a corrections officer responded to Johnson as follows: "You know, you need to shut the fuck up. We'll tell your wife you went quickly[.]" Further record evidence demonstrates that Johnson was screaming and crying out for help, persistently, and all day. Clearly, a reasonable jury could conclude based upon this evidence that non-medical prison officials would have reason to believe that medical personnel were mistreating or not treating Johnson.


FAILURE TO TRAIN

The PrimeCare Defendants argue that a corporate entity cannot be held vicariously liable under § 1983 for the actions of its employees. The County Defendants argue that Warden Medlock is entitled to summary judgment because he had no personal involvement in any constitutional violation. The County Defendants also make this argument as to Defendant Vanmeter Arison. Plaintiffs concede, however, that insufficient evidence exists to keep Vanmeter Arison and Defendant O'Neil in the case; consequently, the Court will dismiss the Amended Complaint against Defendants Vanmeter Arison and O'Neil with prejudice.

In *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978), the United States Supreme Court held that municipalities and other local governmental units are "persons" subject to liability under 42 U.S.C. § 1983. In so ruling, however, the Court declared that municipal liability may not be premised on the mere fact that the governmental unit employed the

offending official, that is, through application of the doctrine of *respondeat superior*. Instead, the Court concluded that a governmental unit may be liable under § 1983 only when its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694. The "official policy" requirement distinguishes acts of the municipality from acts of employees of the municipality, thereby limiting liability to action for which the municipality is actually responsible. *Id*.

In finding municipal liability pursuant to § 1983, the plaintiff must identify the policy, custom or practice of the municipal defendant that results in the constitutional violation. *Id*. at 690-91. A municipal policy is made when a decision-maker issues an official proclamation or decision. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986), *quoted in*, *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990). A custom or practice, however, may consist of a course of conduct so permanent and widespread that it has the force of law. *Andrews*, 895 F.2d at 1480. To establish municipal liability based upon a custom or practice, the plaintiff must demonstrate that the decision-maker had notice that a constitutional violation could occur and that the decision-maker acted with deliberate indifference to this risk. *Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000). Finally, Plaintiff must show a causal connection between the custom or policy and the violation of the constitutional right. *Bielevicz v. Dubinon*, 915 F.2d 845, 850-51 (3d Cir. 1990). That is, a plaintiff must demonstrate an "affirmative link" or "plausible nexus" between the policy, custom or practice and the alleged constitutional deprivation. *Bielevicz*, 915 F.2d at 850-51. "As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *Id*. at 851 (citing *Black v. Stephens*, 662 F.2d 181, 190-91 (3d Cir. 1981)).

PrimeCare Medical, Inc. has a specific written policy entitled: "Training for Correctional Officers." The stated purpose of the policy is "to ensure that all PrimeCare Medical (PCM) facilities have in effect a written policy and training program, which guides the health-related training of all correctional officers working with inmates." (ECF No. 49-5 at 1.) The written policy specifically provides that "[i]t is *imperative* that correctional personnel be able to recognize medical emergency situations and know their responsibility in reporting them to the health care staff." (ECF No. 49-5 at 1 (emphasis added by Court).) The written policy further provides as follows:

> POLICY: PCM and the NCCHC [National Commission on Correctional Health Care] require an annual review and approval of any health care training programs. These programs should be approved by the responsible health authority in cooperation with the jail/prison administrators. PCM staff is available to provide training on an as needed basis. The contract facilities should have a training program which is congruent with PCM policy and NCCHC Standards. Correctional Officers who work with inmates/patients receive health-related training at least every two (2) years. Training should be ongoing, and include but not be limited to:
> A. Administration of first aid.
> B. Recognition of the need for emergency care in common life-threatening situations (i.e. heart attack and potential suicide).
> C. Recognizing acute manifestations of certain common chronic illnesses (i.e. seizures, intoxication and withdrawal and adverse reaction to medications).
> D. Recognizing other common chronic conditions (i.e. mental illness and developmental disability.
> E. Suicide prevention procedures.
> F. Precautions and procedures with respect to infections and communicable diseases.
> G. CPR
> H. Procedures for appropriate referral of inmate/patient health complaints to health care staff.
> . . .
> PCM requires that 75% of all correctional staff be trained and certified in all areas listed above. Although, it is an ongoing goal of PCM that 100% of correctional staff are trained and certified.
> . . .

All training programs should be approved for content and length. All training programs, contents and attendance records should be maintained by and secured within the facility. It is also the responsibility of the PCM health Services Administrator to maintain a file on the training.

(PrimeCare Policy: Training for Correctional Officers, ECF No. 49-5 at 1-2.)

To establish liability on a failure to train theory, a plaintiff must establish that the need for more or different training was so obvious and so likely to lead to the violation of constitutional rights that the policymaker's failure to respond amounts to deliberate indifference. *Brown v. Muhlenberg Township*, 269 F.3d 205, 216 (3d Cir. 2001) (citing *City of Canton*, 489 U.S. at 390). Further, the United States Supreme Court has held that "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a [] 'policy or custom' that is actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).

Defendant Warden Medlock, per the terms of this policy, was responsible for cooperating with PrimeCare in approving these training programs. The terms of the policy itself make clear that it is "imperative" that correctional personnel be able to recognize emergency situations and know their responsibility in reporting them to health care staff. Plaintiffs point to record evidence that corrections officers at the Jail never received the training required by the policy. *See* Locke Dep. at 23, ECF No. 49-6 at 8; Skiles Dep. at 7, ECF No. 49-6 at 9; Medlock Dep. a 44, ECF No. 49-6 at 10; DelVerme Dep. at 22, ECF No.49-6 at 11. Further, Plaintiffs have raised a disputed issue of fact that corrections officers at the Jail were unable to recognize these situations or refused to report them to medical personnel.

Consequently, a reasonable jury could conclude that PrimeCare and Warden Medlock are liable for failure to train. These Defendants do not dispute that Johnson's medical condition represented a serious medical need. Plaintiffs have produced evidence that PrimeCare and Medlock did not follow PrimeCare's policy for training the correctional officers that could have saved Johnson's life. A jury could find that PrimeCare and Medlock's failure to follow policy in not training corrections officers was not an oversight, but had become a custom. Consequently, a reasonable jury could conclude that because of the mandatory language of the policy itself, and the "imperative" that corrections officers be trained in recognizing and reporting medical emergency situations to healthcare staff in order to protect prisoners' health, that PrimeCare and Warden Medlock deliberately and wantonly chose to ignore that policy. *See Sparks v. Susquehanna* County, No.3:05cv2274, 2009 WL 922489 (M.D. Pa. April 3, 2009). A plausible nexus exists between PrimeCare and Warden Medlock's custom of not complying with the policy, and Johnson's death. Therefore, the question of whether the custom proximately caused Plaintiffs' constitutional harm should be left to the jury." *Bielevicz*, 915 F.2d at 851 (citing *Black v. Stephens*, 662 F.2d 181, 190-91 (3d Cir. 1981)).

CONCLUSION

Therefore, for all the foregoing reasons, the Primecare Defendants' Motion for Summary Judgment at ECF No. 32 will be denied in its entirety, and the Motion for Summary Judgment at ECF No. 35 filed by Fayette County Defendants Medlock, O'Neil, DelVerme, Locke, Skiles, and Vanmeter Arison will be denied except as it relates to Defendants O'Neil and Vanmeter Arison.

An appropriate Order will follow.

BY THE COURT

LISA PUPO LENIHAN
UNITED STATES CHIEF MAGISTRATE JUDGE

Dated: January 28, 2011

cc: All counsel of record
    Via electronic filing